corporation, incorporated on April 17, 2003, with its principal place of business at 2700-65 E.

Valley Pkwy, Escondido, CA 92027.

5. Upon information and belief, the principal and Chief Executive Officer of E-TICKETS is

one AARON L. MORTENSEN (hereinafter "MORTENSEN"). MORTENSEN holds himself out

to the business community and the public at large as an employee of E-TICKETS. MORTENSEN

has represented himself to Plaintiff as an "Account Manager," "Account Representative," and/or

"Vice President of Sales."

6. E-TICKETS holds itself out to the business community and public at large as a multi-

faceted company offering a buffet of services to fully provide for all aspects of ticket sales via the

internet.

7. MORTENSEN operates E-TICKETS as his "alter-ego." Upon information and belief,

there are no other voting shareholders in E-TICKETS, and the acts of MORTENSEN and E-

TICKETS are inextricably intertwined.

## JURISDICTION AND VENUE

1. That this is a civil action for conversion, breach of contract, fraud, and misrepresentation.

2. That jurisdiction is conferred on this Court pursuant to 28 U.S.C. §1332, diversity of

citizenship.   Plaintiff is a New York corporation, Defendant is a California corporation, and the

amount in controversy is in excess of $97,073.45, exclusive of interest and costs.

3. Venue in the Southern District of New York is proper pursuant to the terms of a written

"AGREEMENT TO PAY AMOUNTS OWED," dated January 31, 2007 and executed by both

parties.

## FACTS COMMON TO ALL CLAIMS

1. Plaintiff was in the process of staging large-scale New Year's Eve events in five U.S. cities:  New York, New York; Boston, Massachusetts; Los Angeles, California; San Francisco, California; and Dallas, Texas.

2. In preparation for the December 31, 2006 events, Plaintiff arranged for entertainment, catering, wait staff, security, and rented the following venues:  *Gypsy Tea & Eugene*, New York, New York; *Umbria*, Boston, Massachusetts; *Pearl*, Los Angeles, California; *Bambuddha Lounge*, San Francisco, California; and *Metro Grill*, Dallas, Texas.

3. On October 18, 2006, Plaintiff signed Defendants' SOFTWARE LICENSING AGREEMENT (hereinafter "October 18, 2006 AGREEMENT"), providing, *inter alia*, that E-TICKETS would fully service NATION's online ticket sales.   The October 18, 2006 AGREEMENT is annexed hereto as Exhibit "A."

4. MORTENSEN, on behalf of E-TICKETS, represented to YOGMAN that E-TICKETS was a legitimate and reputable business, staffed with several departments, such as corporate, software, sales, customer service, business development, human resources, and billing.   Such representations are also evident on the E-TICKETS website, select screen shots of which are annexed hereto as EXHIBIT "B."  Similar representations are embodied in the marketing materials distributed by E-TICKETS, annexed hereto as EXHIBIT "C."

5. MORTENSEN indicated to YOGMAN that there were numerous executive positions at E-TICKETS, occupied by people other than MORTENSEN.   MORTENSEN made reference to conversations had with his supervisor(s) at E-TICKETS.

6. Notwithstanding MORTENSEN's representations as to the extensive staff of E-TICKETS, MORTENSEN and his wife, REBEKAH MORTENSEN, are the only purported

employees of E-TICKETS to ever contact or converse with YOGMAN.

7. YOGMAN anticipated ticket sales of not less than 2,000. MORTENSEN represented that E-TICKETS had the capacity to service consumer transactions of said quantity.

8. "Section 4.01" of the October 18, 2006 AGREEMENT provided that E-TICKETS would be paid the following in exchange for its e-ticketing services: $1.00 for every ticket sold online and $0.75 for every ticket sold off-line.

9. "Article 4" of the October 18, 2006 AGREEMENT, *inter alia*, provided that taxes and other merchant fees would be paid by Plaintiff by way of deduction from ticket sales. The balance due Plaintiff would be held by Defendants—in Defendants' merchant accounts—and electronically transferred to Plaintiff once a week.

10. In or around September of 2006, YOGMAN asked MORTENSEN if NATION could use its own merchant account in conjunction with the E-TICKETS software. MORTENSEN responded that Plaintiff *could* use its own merchant accounts, but that E-TICKETS had a "legal team" in place to deal with matters relating to its merchant accounts, such as "charge-backs." MORTENSEN alleged that E-TICKETS' legal team had "never lost a chargeback claim." In reliance upon said representation, Plaintiff decided to hold its funds in Defendants' merchant accounts, in lieu of its own private accounts.

11. In and around December 2006, E-TICKETS processed $206,860.00 in ticket sales for NATION through E-TICKETS' merchant accounts. Said ticket sales were transacted via the internet with customers throughout the United States.

12. Pursuant to the October 18, 2006 AGREEMENT, the total sum due Plaintiff was $195,051.66.

13. Notwithstanding the foregoing, E-TICKETS made only four wire transfers to Plaintiff, as described below. Each wire transfer was received by Plaintiff after its legal due date.

| Date | ID No. | Amount |
|------|--------|--------|
| 12/20/06 | 8600532 | $14,844.31 |
| 01/02/07 | 8722794 | $21,965.27 |
| 01/02/07 | 8766962 | $9,969.73 |
| 01/11/07 | 8921760 | $51,198.90 |
| | **Total:** | **$97,978.21** |

14. The total amount transferred to NATION is $97,978.21, leaving a balance due to NATION of NINETY-SEVEN THOUSAND SEVENTY THREE DOLLARS AND FORTY-FIVE CENTS ($97,073.45). Defendants' failure to transfer said funds to Plaintiff is a breach of the October 18, 2006 AGREEMENT. Said breach entitles Plaintiff to an award of attorney's fees, pursuant to "Section 8.05" of said agreement.

15. Commencing in and around December of 2006, YOGMAN sought to contact MORTENSEN several times and made repeated demands for the return of NATION's funds. MORTENSEN evaded contact with YOGMAN.

16. In mid December of 2006, YOGMAN repeatedly requested accounting reports from MORTENSEN. Defendants failed to respond to any of YOGMAN's inquiries or entreaties.

17. MORTENSEN represented to YOGMAN that E-TICKETS would be transferring additional funds to Plaintiff on or about January 9, 2007. YOGMAN asked MORTENSEN for proof of said wire on several occasions, via phone and email. MORTENSEN never provided proof of said wire, and said wire was never received by NATION.

18. On numerous occasions during January, 2007, YOGMAN repeatedly tried to contact MORTENSEN by email and phone, but MORTENSEN did not answer YOGMAN's calls, return his messages, or respond to his e-mails.

19. On or about January 31, 2007, YOGMAN encountered MORTENSEN at a professional trade show sponsored by the International Ticketing Association in Houston, Texas. In response to direct questioning by YOGMAN, MORTENSEN conceded that he is indeed the principal and Chief Executive Officer of E-TICKETS. At that time, the parties agreed that E-TICKETS would wire NATION the sum of $97,073.45 on February 6, 2007. The parties' agreement was embodied in a writing, dated January 31, 2007, (hereinafter "January 31, 2007 AGREEMENT"), which is annexed hereto as EXHIBIT "D."

20. Notwithstanding the terms of the January 31, 2007 AGREEMENT, E-TICKETS has not paid any of the outstanding $97,073.45 to Plaintiff.

21. Notwithstanding Defendants' representations, made both orally and in writing, E-TICKETS' purported "office" is in fact a house trailer in a residential trailer park in Escondido, California. Upon information and belief, said trailer is the private residence of MORTENSEN.

22. Notwithstanding Defendants' numerous representations to the contrary, upon information and belief, MORTENSEN and his wife, REBEKAH MORTENSEN, are the only employees of E-TICKETS.

23. In and around February and March of 2007, one REGINA M. STOCCO filed an "Embezzlement Evaluation" with the Financial Crimes Unit of the Escondido, California Police Department.

24. In said evaluation, STOCCO, owner of TABLE FOR EIGHT DETROIT, LLC, alleges that MORTENSEN "embezzled" anywhere from $26,000 to $50,000 from her business, by and through E-TICKETS' online ticketing service.

25. Plaintiff has had numerous discussions with STOCCO about the nature and character of E-TICKETS. Said discussions have led Plaintiff to reasonably believe that Defendants have been